(No. 15243.—Decree affirmed.)

WILLIAM D. EVANS *et al.* Appellees, *vs.* FREDERICK W. McKINNEY *et al.* Appellants.

*Opinion filed April 18, 1923.*

1. DEEDS—*when delivery by depositary of deed in escrow conveys no title.* Where a deed has been delivered in escrow, delivery by the depositary before the performance of the conditions upon which such delivery is authorized conveys no title.

2. SAME—*when corporation cannot act as escrow agent.* Parties negotiating for a conveyance to be delivered in escrow, and who are in reality merely agents of a trust corporation which is the principal in the transaction, are guilty of fraud where they induce the grantor to make the corporation his escrow agent without his knowledge of the corporation's interest in the transaction, and it is a fraud on the grantor for the corporation to accept the deed under such circumstances.

3. CORPORATIONS—*foreign corporation cannot engage in real estate business in Illinois.* As no Illinois corporation is authorized to engage in the business of buying and selling real property, no foreign corporation can lawfully engage in the business of buying land in Illinois not needed in the proper conduct of its legitimate business.

APPEAL from the Circuit Court of Marshall county; the Hon. T. N. GREEN, Judge, presiding.

WILLIAMS, LOYALL & TUNSTALL, and McROBERTS & MORGAN, for appellants.

BARNES, MAGOON & BLACK, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This case comes to this court on appeal from the circuit court of Marshall county, where a decree was entered in favor of complainants, who are appellees here. The original bill was filed August 6, 1921, by William D. Evans and Jeannette Evans, his wife, in the circuit court of Marshall

county, making Frederick W. McKinney, his wife, Anna, J. N. Lewis, Ernest Lewis, Charles L. Kent and A. P. Grice individually and as trustee, defendants to the bill. The McKinneys, Kent, and Grice as trustee, filed their answers, denying the material allegations of the bill. Replications were filed to the answers. Grice as an individual and the two parties named Lewis were defaulted. The cause was referred to the master to take the proof and report his conclusions, after which some evidence was taken by depositions at Belhaven, North Carolina, and at Norfolk, Virginia, at which latter place the McKinneys and Grice resided. On January 14, 1922, complainants filed an amended bill similar to the original bill, making the Guaranty Title and Trust Corporation of Norfolk a defendant.

The amended bill alleged that on and prior to October 16, 1920, the complainants were the owners in fee and in possession of land in Marshall county, Illinois, (describing it,) known as the Riffey farm, containing 146½ acres and worth $65,925; that H. O. Pattison stated to complainants he had for sale certain lands known as the Shirley tract, comprising .1148 acres and located in Beaufort county, North Carolina; that Pattison represented these lands were level, of high fertility, well adapted for farming and continuous growing of corn and other crops without soil treatment or fertilization and were worth at least $125 an acre; that Pattison and some other parties had an option on the Shirley tract for $100 an acre; that at least 425 acres of the land were free and clear from logs; that ninety per cent of the stumps on the land were of gum trees, well rotted, and could be easily pushed over; that 125 acres were in cultivation, and the balance of the 425 acres could be run over with a disc harrow and after the vegetation had dried a fire could be run through it, after which the land could be plowed and crops successfully grown upon it; that the expense of preparing the 425 acres would not exceed one

dollar an acre; that the remainder of the acreage could be cleared and placed in cultivation for not over two dollars an acre; that there were sufficient ditches running through it to properly drain the tract and that there were two good artesian wells thereon; that to induce complainants to buy the tract, Pattison agreed, as part of the deal, that he and other persons interested in the Shirley tract would purchase at a valuation of $22,000 certain Canadian land belonging to complainants, and the payments thereon would be made to complainants in such amounts and at such times as would take care of a certain second mortgage to be given by them upon the Shirley tract; that the sum of $10,000 was on deposit in the Virginia-Carolina Joint Stock Land Bank at Norfolk to the credit of the then owners of the Shirley land, which would be transferred subject to complainants' order, for development of the Shirley tract; that complainants had never seen or examined the Shirley tract, and relying upon the truth of the several statements, representations and promises of Pattison, they on October 16, 1920, entered into a written agreement with the Pioneer Realty Company of Peoria, Illinois, of which partnership company Pattison was a member.

A copy of the written contract was attached to and made a part of the bill. The written contract in substance provided that the Pioneer Realty Company agreed to convey the property known as the Shirley farm, containing 1151 acres, more or less, to complainants, and the latter agreed to pay therefor the sum of $123,732.50, the payments to be made in the following manner: Complainants to deed to the Pioneer Realty Company the Riffey farm at the price of $65,925, to assume a Federal farm mortgage on the Shirley tract for $37,500, and to execute a second mortgage thereon in the sum of $20,307.50. It was seemingly further agreed that the Pioneer Realty Company was to take certain Canadian land owned by complainants at a valuation of $22,000, the proceeds of this property to be

applied on the second mortgage to be given by complainants on the Shirley tract. The contract also contained other minor details, and was executed by Pattison for the Pioneer Realty Company, and by complainants.

The bill further alleged that on or about December 1, 1920, before the delivery of the deeds and papers mentioned in the agreement, complainant Evans informed Pattison that before complainants would complete the deal a more definite contract relative to the taking of the Canadian land would have to be executed and delivered to complainants; that Pattison agreed that the original contract did not plainly express the intention of the parties, and a new contract was prepared by complainants' attorneys and the provisions thereof were accepted by Pattison; that Pattison re-copied the Canadian land contract, changing it materially, and induced complainants to sign it, they believing it was the original contract prepared by their attorneys; that at the time of signing the last mentioned contract Pattison stated he had sent and assigned the original agreement of October 16, 1920, to the Guaranty Title and Trust Corporation of Norfolk, or to Frederick W. McKinney, of the same place, who were his associates in the deal; that all the members of the Pioneer Realty Company would sign the agreement and it would later be signed and approved by the trust corporation and McKinney; that Pattison and Evans on December 14, 1920, which was the date of the contract last mentioned, went to Norfolk for the purpose of obtaining the signature and approval of the trust corporation to the contract and so Evans might satisfy himself as to the title to the property; that Grice and McKinney were there told that complainants would not complete the deal unless a new contract was executed and delivered relative to the taking of the Canadian land, and that Grice and McKinney said they knew of the provisions of the contract of October 16, 1920, relative to the Canadian land, and promised that the new contract as agreed upon between Evans

and Pattison would be signed and delivered to complainants; that McKinney at that time stated to Evans the condition of the Shirley tract, making the same representations to him as to the value, number of acres logged, number of acres in crop, cost of placing the land in cultivation, as to the ditches and laterals being adequate for drainage of the property, as were formerly made to complainants by Pattison; that McKinney also stated to Evans that there was at that time $9528.92 in cash on deposit in the Virginia-Carolina Joint Stock Land Bank, which fund would be subject to the order of Evans, to be used by him in the improvement of the Shirley tract when the deal was completed. The bill alleged that the Shirley farm was in such condition, with vegetation and underbrush growing thereon, that it was impossible to drive a team over it or to see the condition of the stumps on the land, how much of the land had been logged off and as to what its actual condition was; that complainants relied implicitly upon the representations of McKinney as to the condition of the property, also as to his promise that a further contract would be executed and delivered relative to the taking of the Canadian land, as well as upon his statement as to the amount of cash in the bank to be used by complainants; that relying upon all of the statements, promises and representations of Pattison and McKinney, and that the trust corporation was not interested and could act as escrow agent for the delivery of necessary instruments in connection with the transaction, complainants sent to the trust corporation, properly executed, a deed to the Riffey farm with certain escrow instructions which had been previously prepared by McKinney; that one of the provisions of the escrow agreement was that an agreement be obtained relative to the money in the land bank in amount of $9528.92, whereby said money should be subject to complainants' order; that McKinney did not disclose that the trust corporation had anything to do with the transaction, but that it now appears that Mc-

Kinney was an officer of both the trust corporation and the land bank, and that he knowingly and maliciously deceived and defrauded complainants into sending the necessary instruments to the trust corporation believing it to be a fair and proper escrow agent; that the trust corporation was in collusion with McKinney and was to profit out of the transaction; that Grice, president of the trust corporation, was also president of the land bank; that McKinney was the farm sales manager of the trust corporation and also secretary of the land bank; that Grice, as an individual and officer of the trust corporation, was in collusion with McKinney and knew of the false representations made by him to complainants in the transactions; that Grice, individually and as an officer of the trust corporation, wrongfully and with intent to defraud the complainants, delivered the deed conveying the Riffey farm to McKinney without following the directions in the escrow agreement, and that the deed to the Riffey farm was never legally delivered; that the land bank was a "mere puppet" of the trust corporation; that the offices both of the trust corporation and the land bank were in the same building; that Grice as president of both institutions, and McKinney as an officer of each institution, controlled the conduct of the business of said institutions and both were used to assist them in carrying on extensive land speculations; that some time after the delivery of the deed complainants discovered that all the statements and representations made by Pattison and McKinney to them were false; that there were only about 125 acres of the Shirley tract that was logged; that it would cost $20 an acre to prepare the remaining 425 acres for crop, it would cost $5 an acre for clearing the underbrush, and it would cost $25 an acre to place the balance of the land in shape for crop; that the statement that the Shirley tract cost defendants $100 per acre was false; that the land was not well drained; that it would need fertilization and soil treatment; that McKinney and his associates did not keep

their promise relative to the contract of purchase of the Canadian land and failed and neglected to obtain an assignment of the sum of $9528.92, represented to be in the land bank for the benefit of complainants; that McKinney was interested as principal in all the transactions referred to, and that the Pioneer Realty Company, through Pattison, one of the members thereof, was the agent of McKinney; that after March 1, 1921, McKinney took possession of the Riffey farm and leased it to parties named Lewis; that on March 10, 1921, McKinney and wife executed and delivered a trust deed on the Riffey farm to Grice to secure a supposed indebtedness of $39,100, and that Grice, as trustee, was acting as the agent of McKinney, and that either McKinney, Grice or the trust corporation, or their agents, are now the holders of the note secured by such trust deed; that on account of the false and untrue representations and statements made by McKinney and his failure to perform certain things which he had agreed to do, and because of the wrongful delivery of the deed to the Riffey farm, complainants have been defrauded. Complainants offered to re-convey to McKinney the Shirley tract provided McKinney or the trust corporation reimburse or pay to complainants the sum of $20,000, which sum they expended in the improvement of and payments on the Shirley tract. Complainants pray that the deed to the Riffey farm should be set aside; that the trust deed on said farm given to Grice should be set aside and canceled; that complainants have the fee simple title to the Riffey farm restored to them, and that the tenants occupying the same should be required to account to complainants, as tenants, for rent.

The amended bill was answered by A. P. Grice, trustee, who denied all the material allegations of the bill and alleged the execution and delivery of the trust deed by McKinney and wife to the Riffey farm to secure the payment of a note for $39,100, which funds were actually advanced by the trust corporation; that said note is held and owned

by the corporation and is a first mortgage on the property. The answer also set up the Statute of Frauds of the State of Virginia, where delivery of all instruments pertaining to the transaction was made and the performance of all things connected therewith was to be done. The Guaranty Title and Trust Corporation answered the amended bill, denying the material allegations thereof and alleging the conveyance of the Riffey farm by complainants to McKinney, and the execution of the trust deed by McKinney and wife to Grice to secure a note for $39,100, funds advanced to McKinney for use by him in purchasing the Shirley tract. Its answer also alleged that before advancing said funds it relied upon representations to it by letter from Evans, wherein he stated he had made a personal examination of the Shirley tract and that the land was better than represented; that the note is now held by the trust corporation and is unpaid. The answer also claims the benefit of the Statute of Frauds of Virginia. The McKinneys also filed an answer to the amended bill, denying its material allegations and alleging the Shirley tract is of great value and a sufficient consideration for the conveyance of the Riffey farm by complainants to McKinney; that complainants had full and ample opportunity to know the facts, and did inspect and have full knowledge of the land before the exchange of deeds. The Statute of Frauds of the State of Virginia was also set up and its benefit claimed as a defense. Charles L. Kent also answered the amended bill, and replications were filed to all the answers.

The master, after hearing the proof, consisting of oral testimony and depositions taken in Virginia and North Carolina, made his report recommending a decree in favor of complainants, to which many objections were filed, and all except two were overruled by the master and stood as exceptions. Later, on October 21, 1922, complainants again amended their amended bill, the amendment thereto being an allegation that the Guaranty Title and Trust Corporation

was the principal in all the transactions pertaining to the deal with complainants, and that it is a foreign corporation doing business in the State of Illinois contrary to the law thereof.

The previous answers were ordered to stand as answers to the bill as last amended. Exceptions to the report of the master were overruled by the court, the report approved and a decree entered on November 20, 1922. By the decree the warranty deed dated January 5, 1921, from complainants conveying the Riffey farm to McKinney was held null and void and ordered expunged from the records of Marshall county; the trust deed of March 10, 1921, from McKinney and wife to Grice, affecting the Riffey farm, was canceled, ordered expunged from the records and the title vested in complainant Evans free and clear of any claim whatsoever of any of defendants; the Guaranty Title and Trust Corporation was ordered to pay the sum of $8760.07 to complainants,—which the court found to be the difference between the amount complainants spent in improving the Shirley land and the amount they received from the land bank; also all rents and profits received or earned from the Riffey farm from March 1, 1921, and a reference was made to the master in chancery for the purpose of ascertaining such amount. The decree also provided for the payment of costs of suit by the trust corporation, the delivery of possession of the Riffey farm to complainants, and the execution and delivery by complainants of a deed for the Shirley tract to the trust corporation upon payment by it of the amounts mentioned in the judgment and decree. From this decree the McKinneys, the Guaranty Title and Trust Company and A. P. Grice, as trustee, have prosecuted this appeal.

The master found Pattison made the representations alleged in the bill as to the character and value of the Shirley land; that the Canada land of Evans was to be taken as part of the consideration for the Shirley tract and applied

on the second mortgage given by Evans on that land;. also that there was a balance of about $10,000 in the Virginia-Carolina Joint Stock Land Bank which would belong to Evans upon the completion of the transaction; that at the time the contract was made, in October, 1920, Evans had not seen the Shirley tract and knew nothing about it, and that the representations made by Pattison were believed to be true by Evans and were relied on by him when the contract was entered into; that before the deeds were delivered Evans informed Pattison he would not complete the transaction until he had a more definite and valid contract for the purchase of the Canada land; that Pattison admitted the contract of October 16 did not fully express the agreement with reference to that land; that a new contract was prepared in the office of the attorneys of Evans in Peoria; that it was afterwards changed by Pattison, and Evans signed it without any knowledge of the change, and it was then taken to Norfolk, Virginia, to McKinney for the purpose of getting his acceptance and signature; that when Evans went to Norfolk he told McKinney he would not proceed further until he was satisfied as to the title of the Shirley land and unless the new contract with reference to the Canada land was accepted and signed; that McKinney told Evans that Pattison was his agent at Peoria; that the matter of the Canada land would be taken care of and that Evans could safely proceed to a consummation of the deal; that relying upon the statements of Pattison and McKinney with reference to the character of the land, the cost of clearing it, the artesian wells, the sufficiency of the drainage, and the sum of $10,000 on deposit in the land bank which would be subject to his order for use in development of the Shirley land, and that the matter of the Canada land would be fixed, Evans proceeded to transfer the Riffey farm to McKinney.

The decree approved the report and findings of the master, and found, substantially, that at the time the contract

of October 16, 1920, was made Evans knew nothing about the Shirley land and was induced to enter into the contract by representations made by Pattison as to the quality of the soil, its productiveness, the character of the land and the cost of putting it in condition for cultivation, and the agreement that Evans' Canada land was to go into the transaction at a valuation of $22,000 to take care of the second mortgage Evans was to give on the Shirley land, and also that Evans was to get $10,000 in the Virginia-Carolina Joint Stock Land Bank to the credit of the former owners of the Shirley land when the deal was completed; that the contract was a few days after its date assigned by the Pioneer Realty Company to the Guaranty Title and Trust Corporation and sent to that company; that afterwards, in December, 1920, before any deeds were executed and delivered, Evans told Pattison he would not complete the deal until he had a more definite and valid contract about the Canada land; that Pattison admitted the contract of October 16 did not express the agreement of the parties as to the Canada land and a new contract was prepared by Evans' attorneys, which Pattison took from the attorneys' office and unknown to Evans changed it and induced him to sign it under the belief it was the same contract prepared by his attorneys; that Pattison took the new contract to Norfolk to get McKinney to approve and sign it; that Evans accompanied Pattison to Norfolk, and he there told McKinney he would not proceed further with the deal unless a new contract with reference to the Canada land was signed and delivered to him; that McKinney promised the matter of the Canada land would be taken care of, and told Evans he could safely proceed with the deal and that the new contract would be accepted, and on the faith of these promises Evans proceeded to complete the deal; that Evans then went to the land; that except what was in cultivation it was covered with a thick growth of vegetation, brush and briars, impossible to drive a team through and prac-

tically impossible to walk over and inspect it; that these conditions concealed the true condition of the land as to stumps, logs and drainage, which were not open and visible, and Evans did not know the expense of preparing the land for cultivation but relied on the statements of Pattison and McKinney; that at the request of Pattison and McKinney he sent the trust corporation the deed for the Riffey farm with a letter of escrow instructions, which, among other things, provided: "You are to secure from the original owners or grantors of said Shirley farm a proper written agreement or understanding that the cash balance now in the hands of said Virginia-Carolina Joint Stock Land Bank, amounting to $9528.92, shall after the delivery of said deeds be subject to my order." At the time this was done, the decree finds, neither the Pioneer Realty Company nor Mc-Kinney had disclosed to Evans that the trust corporation was to profit by the transaction, and induced Evans to send that corporation the deed under belief it was a disinterested, fair and proper escrow agent, when, as a matter of fact, it was the real principal in the transaction, which was shown by a contract between it and the Pioneer Realty Company introduced in evidence; that Grice, president of the trust corporation, was familiar with the contract of October 16 and all the transactions, and told Evans, before the delivery of the deed under escrow directions, that whatever Mc-Kinney said would be taken care of all right. The decree finds that at the time the contract of October 16 was made neither the Pioneer Realty Company, McKinney nor the trust corporation had title to the Shirley land or an option on it and had no title at the time of the delivery of the escrow agreement and deed to the Riffey farm; that the land bank is operated in the same building with the trust corporation and a great deal of the bank stock is held by those interested in the trust corporation; that Grice is president of both corporations and McKinney at the time of the transaction was an officer of the trust corporation, act-

ing as its farm sales manager, and was also secretary of the land bank and had access to the records of both corporations; that he could have known the balance on deposit with the land bank which would be subject to the order of Evans as purchaser of the Shirley tract; that after the delivery of the deed to the Riffey farm certain sums were paid from the amount in the land bank on the order of Evans' sons, who were in possession of the Shirley land making improvements and attempting to farm it, but no statement of the amount of said fund was ever made to Evans until after March 11, 1921, and no written statement of the former owners of the Shirley land was secured showing the balance in the land bank to be $9528.92, as in and by the escrow agreement was provided; that after the delivery of the deed for the Riffey farm to the trust corporation the balance in the land bank was depleted so that it amounted to only $7900; that McKinney and the trust corporation refused to make good the deficit and to comply with the contract, and for that reason there was no valid delivery of the deed for the Riffey farm to McKinney; that the acts of McKinney, the Pioneer Realty Company and the trust corporation in refusing to comply with the agreement between the parties as to the Canada land were fraudulent as to the rights of Evans; that instead of there being 425 acres of the Shirley land logged there were not more than 125 acres; that instead of 125 acres being in cultivation there were only 60 acres; that it would cost to clear and prepare the 425 acres for crops an average of $20 an acre; that the growth on the land could not be pulverized, disced and burned but would require chopping and cutting the shrubs off, and that to prepare the balance of the land for cultivation would cost $20 per acre; that there was but one artesian well on the land; that the land was not sufficiently and adequately drained; that the top soil was not as represented; that the land was but a few feet above sea level; that the top soil was composed of decayed vegetation; that

the land was part of what was commonly known as the Dismal Swamp, and the character of the soil such that when dry it easily burned and water would not readily pass through it to supply moisture to vegetation growing on the surface; that the Pioneer Realty Company acted under a contract between that company and the trust corporation; that McKinney in all the transactions was an officer of and farm sales manager for the trust corporation; that that corporation was to profit by the transaction, and was the principal and bound by and responsible for all acts, statements and agreements of the Pioneer Realty Company and McKinney; that Evans spent $16,660.07 in clearing and developing the land and in clearing the drainage ditches; that that amount was the usual, reasonable and customary cost of doing such work in that vicinity and has increased the fair cash value of the land to the extent of the amount expended, and he should be paid said sum less $7900 which he drew from the land bank; that the difference ($8760.07) which should be paid Evans did not include money expended in crop operations, purchase of stock and equipment or for any loss in that respect; that as soon as Evans discovered the Pioneer Realty Company, McKinney and the trust corporation would not make good the balance he should have received from the land bank and would not deliver the contract with reference to the Canada land but refused to be bound by the provisions agreed upon, and as soon as he was advised of and knew the true condition of the land in regard to drainage, stumpage, the amount logged, quality of the soil, cost of preparing the land for cultivation and that there was but one artesian well, he rescinded the contract for fraud which had been practiced upon him and demanded a re-conveyance of the Riffey farm; that the trust deed executed by McKinney and wife to Grice, trustee, on the Riffey farm to secure $39,100 payable to the trust corporation was a device to conceal the true nature of the transaction and the fact that the trust corporation was the

308—8

principal in the land trade, and for the further purpose of evading the law of Illinois, the trust corporation being organized under the laws of Virginia and never licensed to engage in business in this State; that McKinney holds the title to the Riffey farm in trust for the trust corporation. The decree finds that the contract of October 16 is null and void and all transactions based ·on it are void; that the warranty deed from Evans to McKinney to the Riffey farm is inoperative to convey title and should be expunged from the records; that the trust deed from McKinney to Grice, as trustee, held by the trust corporation, should be expunged from the records and held void and of no effect.

The evidence is so voluminous that we shall not undertake to set out, even in brief, much of its substance. The oral testimony occupies more than 1000 pages of the record and written instruments introduced as exhibits occupy 200 pages. We have set out the bill and the findings of the decree pretty fully, so as to obviate the necessity of setting out in detail the substance of the testimony which we hold sustains the bill and the decree. A consideration of the testimony is convincing that Evans was induced by the representations of Pattison as to the character and value of the Shirley land to enter into the contract of October 16, 1920. At that time Evans had not seen the land. We think it is conclusively shown the Canada land of Evans was agreed to be taken in the trade at $22,000, to be applied in payment of the second mortgage he agreed to give on the Shirley land. By promises and representations of Pattison, McKinney and Grice, which were never kept or intended to be kept, Evans was induced to deliver the deed for the Riffey farm to the trust corporation in escrow without that part of the agreement being definitely and clearly expressed in writing. McKinney also misrepresented the character and value of the Shirley land to Evans when Evans went to Norfolk in December. The testimony abundantly shows the land was not of the character or of the

value represented to Evans by Pattison and McKinney. It was part of the Dismal Swamp of North Carolina, could not be put in condition for cultivation without the expenditure of a vast sum of money for clearing and ditching, and, even after that was done, the soil, which was but little above sea level, was not of a character that it would be profitable to farm it. The proof tends to show that the entire Shirley tract was not worth more than the Riffey farm. The top soil was composed of decayed vegetation, would dry out very quickly after a rain and would burn. The stratum underneath the top soil on much of the land was almost impervious to water.

Appellants contend there was no fiduciary relation between the parties to the contract, and that even if Evans agreed to the trade relying on the representations made to him as to the character and value of the Shirley land, he ratified the contract after he had examined the land and was in possession of it. Evans testified he went to Norfolk in December to see about the title to the land, and while there went down to Pantego, which is near the Shirley land, and was on the land on three different days; that one day he was on the land about an hour, one day about an hour and a half, and one day not over a half hour. His two sons were then, as we understand it, on the land, and he was assisting them in procuring teams, implements and preparing buildings for farming the land. It is quite apparent he made no real examination of the land on any of those visits. He testified it was covered with briars, brush, logs and stumps as far as he could see in the jungle, and that it would have been very difficult to walk over the land. He was never more than twenty rods in the brush and briars on those occasions. On his return to Norfolk from Pantego in December he signed a letter which was directed to the Guaranty Title and Trust Corporation, which is strongly relied on by appellants as estopping him from afterwards

repudiating the contract. That letter was written on the stationery of the trust corporation and is as follows:

"*December 23, 1920.*
"*Guaranty Title and Trust Corporation, Norfolk, Virginia:*
(For attention of Mr. A. P. Grice, President.)

"Gentlemen—In connection with my contract of purchase on the so-called Shirley tract, embracing 1148.6 acres, located in Beaufort county, N. C., I beg to state that I have made a personal examination of this tract, and have further gone into all the facts relative to the title as shown by the minutes furnished by the Virginia-Carolina Joint Stock Land Bank. I have found conditions satisfactory in every way, the land being better, in my judgment, than was represented to me. The title, I am satisfied, is, (owing to the fact that the Guaranty Title and Trust Corporation have by letter on the 17th day of December, 1920, guaranteed to furnish me with one of their guaranty policies, if desired, for the full purchase price of the farm, and have furthermore agreed at their expense to complete the minutes referred to, showing title in myself,) a merchantable title.

"I am leaving to-day for Peoria, Ill., my home, and upon my arrival there I will at once forward my deed to the Riffey farm to the Guaranty Title and Trust Corporation to be placed in escrow, to be handled in accordance with the general terms of my contract with the Pioneer Realty Company, which I understand has been assigned to the Guaranty Title and Trust Corporation, and further in accordance with your letter of December 17, 1920, addressed to me. In fact, you may consider that, so far as making any payments to the present owners of the land is concerned, the deal is absolutely closed, for I will carry out all features of it just as per contract.

"Yours very truly,
Wm. David Evans."

The letter was dictated by Pattison in the board of directors' room of the Guaranty Title and Trust Corporation to one of its stenographers, was written on stationery of the corporation, and later reached and was read by Grice, the president of the corporation. Evans testified the letter was not dictated in his presence; that Pattison said he wanted some word from witness stating that the title was all right. Evans' boys were in North Carolina and ready to go to work on the Shirley tract, and Pattison was threatening to hold them up in their work unless witness would

sign the letter. At this time, Evans testified, he had not discovered or realized the falsity of the representations or promises made to him relative to any of the provisions of the contract in connection with the deal. Evans stated McKinney asked him to sign the letter, which he did without reading it carefully, as it was handed to him to sign just before he was leaving for the train. Pattison testified he dictated the letter as stated and that he was present when Evans signed it; that McKinney was there, at the other end of a long table, apparently engaged in other matters; that McKinney never saw the letter until after it was signed and in the possession of Pattison. Witness also testified he wanted the letter because Evans had vacillated back and forth and hadn't closed up the deal, and witness wanted to know once and for all that it was closed, as he was getting sick and tired of it. McKinney testified the letter was written in the offices of the corporation; that probably he read it out loud or else it was read by Pattison aloud, and it was signed in his presence; that he approved the letter and thought it desirable to have possession of it, as he had been told Evans frequently went back on his word. Witness kept the letter from that time till the time of trial.

There seems to be some discrepancy as to just what happened at the time of the signing of the letter. At that time, so far as the record shows, there was nothing further for Evans to do except place his deed in escrow, which, upon his return to Peoria, followed within a few days. However, as yet the more explicit agreement as to the Canadian land had not been delivered to Evans, and the record shows title to the Shirley tract had not been obtained by the Pioneer Realty Company or any of its associates. The record shows the letter was the production of Pattison and was approved by McKinney. Both testify, in substance, they wanted it for the purpose of binding Evans to take the Shirley land and make and deliver the deed for the Riffey farm. They and Grice, president of the trust cor-

poration, knew they had not complied with the terms of the agreement on their part, and induced Evans to sign the letter in order to make it more safe for them to go ahead and secure the title to the Shirley land. In view of all the evidence and the circumstances of signing the letter, we think the court was correct in decreeing that the letter was not a ratification by Evans and that he was not estopped thereby to rescind. Some later correspondence of Evans was also introduced and relied on to show Evans, after subsequent visits to the Shirley land while it was being cultivated in crops by his sons, expressed satisfaction with the land, but it is evident from that correspondence that he was greatly troubled about the deal and that unless the parties he was dealing with would assist him he could not handle it. In one of his letters he expresses the fear that he will lose his mind, that his family will be broken up, and that they can never be happy again.

We are convinced from the evidence, as the court and master were, that the soil of the Shirley land was of such a character that one who was unfamiliar with it could not discover its unfitness for farming purposes without actual experience or observation of its use for farming purposes. As soon as this became apparent to Evans he demanded a rescission. It is quite apparent, too, that Evans relied on the parties he was dealing with taking the Canada land as agreed and on his getting the full amount of $9528.92 in the land bank. In neither of these respects did appellants perform their agreement. Evans was induced to deliver the deed for the Riffey farm to the trust corporation as escrow agent without any knowledge of its interest in the deal, and the deed was delivered to McKinney without the execution of the contract as to the Canada land, and the amount in the land bank Evans was to get was never secured or transferred to him. The delivery of the deed for the Riffey farm was not in compliance with the escrow instructions. Those instructions did not mention the Canada land con-

tract, but they did direct the procuring of an assignment to Evans of $9528.92 in the land bank. The delivery of the deed to McKinney before the conditions upon which it was to be delivered were complied with was unauthorized. It has been uniformly held that the delivery of a deed by the depositary before the performance of the conditions upon which its delivery was authorized conveys no title. *Forcum* v. *Brown,* 251 Ill. 301; *Osby* v. *Reynolds,* 260 id. 576; *Chicago Land Co.* v. *Peck,* 112 id. 408.

The Pioneer Realty Company was the agent of and acting for the Guaranty Title and Trust Corporation, which was the real principal with Evans in the deal. This is shown by its contract with the Pioneer Realty Company dated April 1, 1920, whereby it was agreed that on "all original sales" each party was to receive fifty per cent of the net profits, and on all re-sales the trust corporation was to receive twenty-five per cent and the Pioneer Realty Company seventy-five per cent of the net profits. The term "sales" was to include "exchanges, trades or transactions." We can understand that contract in no other sense than that the trust corporation was the principal in the exchange of the Shirley land, and that the Pioneer Realty Company, and also McKinney, were its agents. This was unknown to Evans when he delivered his deed in escrow to the corporation, and it was a fraud on him for the trust corporation to accept the deed for the Riffey farm as escrow agent for the grantor. This fraud was further emphasized by the delivery of the deed to McKinney, the trust corporation's agent, contrary to the written instructions.

Appellants are in no position, in view of their conduct and the position they occupy in the transaction, to rely on a ratification by Evans. It is plain he did not fully know, and could not in the exercise of reasonable diligence have known, the real character and value of the land when he wrote the communication relied on by appellants. The evidence warrants the conclusion that all the parties interested

in the trade of the Shirley land were exceedingly anxious to put Evans in a position whereby he would be compelled to convey his Riffey farm and take the Shirley land. This they thought they had accomplished when they secured his signature to the letter dictated by Pattison on December 23, 1920. Evans, it is true, was a man of reasonable intelligence with a fair education. He was a preacher of the Gospel but had also had some experience in trading in land. However, the record shows the appellants and the Pioneer Realty Company were guilty of so much deception and so many false statements and representations which Evans relied upon and believed to be true, that we agree with the decree that the whole transaction should be set aside, including the trust deed to Grice, as trustee of the trust corporation, to secure the $39,100. *Gilbey* v. *Hamlin,* 297 Ill. 258.

Evans insisted on the Canada land going in the deal and was led to believe that that part of the agreement would be complied with. McKinney denied he had any knowledge of the agreement of December 14 about the Canada land and denied Pattison ever told him anything about it. He admitted noticing the reference to the Canada land in the original agreement but says that was all he knew about it. Pattison testified to securing the signature of Stitely and Keith, his partners, to the contract for the Canada land, but that McKinney "turned it down." How could he turn it down if he had never heard of it? It is plain from Pattison's testimony that he intended it to be understood that he at least talked with McKinney about signing that contract. If Evans' testimony is to be believed, (and we see no reason why it should not be,) McKinney knew about the Canada land contract. Evans testified that when he was in Norfolk in December he discussed the Canada land contract with McKinney and why it was prepared. At first McKinney said he could do nothing with it and they might as well drop it. He finally said the first thing to do was to get the deeds in escrow. "He said the Canada contract

would be taken ·care of to my satisfaction." Evans also talked to Grice about the matter, and Grice told him the Shirley tract was a good piece of land and he could rely on anything McKinney told him in regard to it. After those talks Evans returned home and sent the trust corporation the deed for the Riffey farm. McKinney testified on the hearing that he never intended to take the Canada land in the deal.

Independently of the fact that the Guaranty Title and Trust Corporation could not lawfully engage in the business of buying land in this State not necessary to the proper conduct of its legitimate business, (*Walker* v. *Taylor*, 252 Ill. 424,) we think the decree is clearly supported by the evidence, and it is affirmed.

*Decree affirmed.*